In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by JAMES A. BEHA, as Superintendent of Insurance, Appellant and Respondent, for an Order to Take Possession of the Property of the SECOND RUSSIAN INSURANCE COMPANY, Appellant and Respondent.

HOWARD SUTHERLAND, as Alien Property Custodian of the United States, Respondent and Appellant.

(Argued March 23, 1931; decided May 12, 1931.)

*James F. Donnelly, Alfred C. Bennett, John M. Downes* and *Clarence C. Fowler* for Superintendent of Insurance, appellant and respondent. The demand of 1919 was ineffective to vest title in the Alien Property Custodian as to commissions accruing thereafter. (*Matter of Bendheim,* 124 Misc. Rep. 424; 214 App. Div. 716; *Matter of Sutherland,* 23 Fed. Rep. [2d] 595; *Farmers' Loan & Trust Co.* v. *Miller,* 2 Fed. Rep. [2d] 493; *Kahn* v. *Garvan,* 263 Fed. Rep. 909; *Miller* v. *Rouse,* 276 Fed. Rep. 715.)

*Robert J. Sykes, Paul Bonynge* and *Daniel A. Dorsey* for Second Russian Insurance Company, appellant and

respondent. The Custodian's attempted seizure of future earnings under the contract was futile. (*Noble* v. *Great American Ins. Co.*, 200 App. Div. 773; 235 N. Y. 589; *Hart* v. *City Theatres Co.*, 215 N. Y. 322.)

*Nathan Ottinger* and *Charles J. Schuck* for Alien Property Custodian, respondent and appellant. As the Custodian, by reason of the demand, had title to the commissions, his claim was entitled to preference over all others, regardless of their character, and the liquidator was holding property which belonged to the Custodian and not to the company. (*Kohn* v. *Jacob & Kohn*, 264 Fed. Rep. 254; *Munich Reinsurance Co.* v. *First Reinsurance Co.*, 6 Fed. Rep. [2d] 742; *Youghioheny* v. *Lasevich*, 176 N. W. Rep. 815; *United States* v. *Chemical Foundation*, 272 U. S. 1; *Banco Mexicano* v. *Deutsche Bank*, 263 U. S. 591; *Matter of Miller*, 281 Fed. Rep. 164; *Miller* v. *Lautenburg*, 209 App. Div. 608; *Central Union Trust Co.* v. *Garvan*, 254 U. S. 554; *Bean* v. *Stoddard*, 207 App. Div. 276; *Miller* v. *Kaliwerke Gesellschaft*, 283 Fed. Rep. 746.) The demand operated, without service of any additional demands, to capture all commissions accruing after its date and even after the war, all of which commissions had accrued prior to the appointment of the liquidator herein. (*Mutzenbecher* v. *Ballard*, 16 Fed. Rep. [2d] 174; *Miller* v. *Lautenburg*, 239 N. Y. 132; *United States* v. *Chemical Foundation*, 272 U. S. 1; *Matter of Bendit*, 214 App. Div. 446; *Matter of Bendheim*, 214 App. Div. 716; *Hess* v. *Miller*, 6 Fed. Rep. [2d] 388; *Matter of Miller*, 281 Fed. Rep. 764; *Rumely* v. *United States*, 293 Fed. Rep. 532; *Matter of Sutherland*, 23 Fed. Rep. [2d] 595; *Kahn* v. *Garvan*, 263 Fed. Rep. 909; *Miller* v. *Rouse*, 276 Fed. Rep. 715; *Garvan* v. *Marconi*, 275 Fed. Rep. 486.)

KELLOGG, J. The Second Russian Insurance Company of St. Petersburg, Russia, a Russian corporation, in July, 1913, entered into a contract with H. Mutzen-

becher, Jr., of Hamburg, Germany, a partnership, for the establishment of a branch office in New York city, to conduct reinsurance business in the United States. Mutzenbecher was to act as general manager of the business in this country and was to receive for its services compensation to be equal to a certain percentage upon net premiums received. Mutzenbecher employed Meinel & Wemple, Inc., a New York corporation having its principal office in New York city, as its subagents to carry on the business. It procured the Second Russian to make a formal appointment of the Meinel company as its general agent and to issue to it a power of attorney. The Second Russian made deposit of the required amount of money, to enable it here to do business, in a New York bank, under a deed of trust. The statutory conditions having thus been complied with, the Second Russian secured offices in New York city, and through Mutzenbecher and its subagent Meinel & Wemple, Inc., began to function in this country as a reinsurer of fire risks directly written by other companies. A flourishing business was done through a period of years. Finally, in the early part of the year 1925, the State Superintendent of Insurance, acting under section 63, subdivision 1 (e), of the Insurance Law (Cons. Laws, ch. 28; *Matter of People [Second Russian Ins. Co.]*, 244 N. Y. 606), which provided for such action when " further transaction of business would be hazardous to its policy holders, or to its creditors, or to the public," took possession of the property and business of the Second Russian, pursuant to an appropriate order duly obtained. Meanwhile, in June, 1919, the Alien Property Custodian, acting under the Trading with the Enemy Act (40 U. S. Statutes at Large, 411), had served a written demand upon Meinel & Wemple, Inc., managers of the New York branch of the Second Russian, to pay over to him all commissions payable to H. Mutzenbecher, Jr., an alien enemy, on account of business previously done, and all commissions which

might become payable upon business done thereafter. At the date when the Superintendent took possession, unpaid commissions due Mutzenbecher, if due at all, calculated upon net premiums then previously received, totalled $79,261.11. Pursuant to a notice served by the Superintendent, calling for the filing of claims, the Alien Property Custodian filed a claim for commissions due. The claim was disallowed by the Superintendent. Later, the Special Term of the Supreme Court determined that the claim of the Custodian, then amounting, with interest added, to $140,788.73, was a " Class 1 claim," that it was " entitled to be paid in preference to all other claims," and directed the Superintendent of Insurance forthwith to pay over the amount named to the Alien Property Custodian. The Appellate Division modified the order in respect to the percentage of interest which was payable and otherwise affirmed.

The contract giving rise to the claim for commissions was made at St. Petersburg, Russia. The parties thereto were H. Mutzenbecher, Jr., a partnership composed of German citizens, and the Second Russian Insurance Company, a Russian corporation. As the claim originated in an alien country, through a contract between aliens, it was a foreign claim, not entitled to a share in the distribution made by the Superintendent of Insurance, from the funds received by him. (*Matter of People* [*Norske Lloyd Ins. Co.*], 242 N. Y. 148.) Of course, if the claim were protected by a lien, such as a mortgage, an attachment, or an equity in the nature of a lien, the title of the Superintendent to the funds taken over would be subject thereto, in so far as the lien bound any portion of the funds so taken, and the claimant would then be entitled to payment, to the extent that the funds so encumbered might pay him. (*Matter of People* [*Second Russian Ins. Co.*], 253 N. Y. 589.) The claimant may not succeed herein, therefore, unless, through his demand made in June, 1919, he acquired a property interest in or lien upon the specific

funds now in the possession of the Superintendent, or in some portion thereof.

The contract entered into between the Second Russian Insurance Company and H. Mutzenbecher, Jr., in July, 1913, expresses an appointment of the Mutzenbecher firm as the exclusive representative of the Second Russian " for doing Fire Re-insurance and/or Retrocession business with companies domiciled or represented in the United States of North America." It recites that, at the request of Mutzenbecher, it has executed a full power of attorney, for the conduct of the business, to Meinel & Wemple, Inc. It provides that Mutzenbecher, as compensation for its services, will receive a commission of three and one-half per cent, " computed on the annual Net-Premium on the treaties received from you." Mutzenbecher is to bear all expenses and handle all business in the proper way. It is " to establish an exact card system of the ceded risks, which will make it possible at any time to have a control on risk limits, to examine the losses, to examine the accounts of the ceding companies, as well as to execute the work, according to our instructions, for the necessary retrocessions." In the event of cancellation of the agreement, commissions shall continue " on all treaties then in force and while such treaties remain in force, i. e., as long as a business connection between us and those companies, which you brought or will bring in connection with us, exists." However, Mutzenbecher " is obliged to carry on in those cases the business according to the terms of this agreement even after cancellation of this agreement."

It was pursuant to the terms of this contract that the New York branch of the Second Russian began to function under the management of Mutzenbecher's subagents, Meinel & Wemple, Inc. Treaties of reinsurance were made with various insurance companies writing direct insurance, whereby the Second Russian took over risks previously insured and reinsured them. For this reinsur-

ance premiums became due from various companies to the Second Russian. Meinel & Wemple, Inc., collected these premiums. After deducting the required reserves for unearned premiums, and depositing the same with the New York Life Insurance and Trust Company, as trustee, Meinel & Wemple, Inc., transmitted the balance of the premiums received to Mutzenbecher at Hamburg, together with various documents in relation to the risks reinsured. From the amounts so received Mutzenbecher deducted the expenses of the business, and their own commissions at three and one-half per cent, and remitted the balance to the Second Russian. From their own commissions Mutzenbecher also remitted to Meinel & Wemple, Inc., three-quarters of one per cent of the net premiums, for the commissions of that corporation for doing the business in New York.

The Russian Government, in October, 1916, promulgated a ukase forbidding its citizens from entering into any commercial relations with citizens of its then enemy, the German Empire, and declaring at an end all existing relationships between the citizens of the two countries. Intercourse and business dealings between Mutzenbecher and the Second Russian were no longer possible, without violation of Russian law. Accordingly, the Second Russian, acting through its officials at St. Petersburg, made an agreement with Meinel & Wemple, Inc., whereby the latter should become its general agents in New York, and should receive for itself, as compensation for handling the business, commissions at the rate of three and one-half per cent on the net premiums received. Thereafter Meinel & Wemple, Inc., made no more remittances to Mutzenbecher in Hamburg. It continued to deduct from all net premiums received three and one-half per cent on account of commissions. Nevertheless, it retained for itself a sum equal only to three-quarters of one per cent of the net premiums, the precise sum paid to it during the Mutzenbecher management. The balance

was withdrawn by it from the funds of the Second Russian, in its regular bank of deposit, and deposited to the credit of itself in the American Exchange National Bank where its own deposits were carried. On its books these deposits were made to appear as a " suspense reserve account."

Prior to the 15th day of October, 1918, there had been withdrawn from the funds of the Second Russian, and deposited to the credit of Meinel & Wemple, Inc., in the American Exchange National Bank, the sum of $15,801.31. This sum represented commissions at three and one-half per cent upon net premiums received after remittances to Mutzenbecher had ceased to be made, less three-quarters of one per cent deducted by Meinel & Wemple, Inc., as commissions for its services. On the books of the corporation these moneys appeared in " a suspense reserve account." On the day named the Alien Property Custodian made a demand for the moneys so deposited as moneys belonging to and reserved for H. Mutzenbecher, an enemy alien. In obedience to the demand the moneys were paid over. Thereafter, an action was brought by the Second Russian, to recover the moneys so paid, against the Alien Property Custodian, pursuant to section 9 of the Trading with the Enemy Act (40 U. S. Statutes at Large, 411).

The controversy thus arising was finally determined by the United States Supreme Court (*Second Russian Ins. Co.* v. *Miller*, 268 U. S. 552) in favor of the Alien Property Custodian. The court approved a finding by the trial court that the appointment of Meinel & Wemple, Inc., by the Second Russian, as its general agents in the United States in lieu of H. Mutzenbecher, Jr., after the promulgation of the Russian ukase of July, 1916, was fictitious; that it was made to avoid the appearance of violating the Russian law; that in point of fact the Mutzenbecher firm remained the general agents entitled to commissions at three and one-half per cent. Further-

more, it held that the sum of $15,801.31, which had been segregated from the general funds of the Second Russian and deposited in the American Exchange Bank, as " a suspense reserve account," had been so deposited for the benefit and to the use of H. Mutzenbecher, Jr.; that Mutzenbecher was the owner of the specific moneys so held. Thus the court said that the moneys in the suspense account were placed there " for the benefit of the Mutzenbechers, with the knowledge and consent of the appellant " (Second Russian); that the appellant was, therefore, in no different situation with respect to the fund " than it would have been if it had paid over the commissions directly to the Mutzenbechers or to their authorized agent; " that " payment of the commissions was made as effectually as if the payment had been by cash in hand; " that the appellant " had relinquished all claim to the fund and Meinel held it for the Mutzenbechers." In other words, the demand made by the Custodian was for a specific fund, which had been segregated from the funds of the Second Russian in its own bank of deposit, and placed to the credit of Meinel & Wemple, Inc., in a different bank, where it was held, as the court determined, for the benefit of H. Mutzenbecher. Therefore, H. Mutzenbecher had a property interest in the specific fund; therefore, the Custodian succeeded to an interest in specific property; consequently, the Second Russian had no interest therein.

The situation in respect to commissions, accruing, if at all, subsequently to the Custodian's demand in October, 1918, is wholly different. On June 27, 1919, when the Custodian's second demand was made, commissions calculated at three and one-half per cent on net premiums received, less commissions previously paid to the Custodian, totalled $13,032.43. Not a dollar of this amount had been withdrawn from the bank of deposit of the Second Russian; not a dollar had been segregated from its general funds and placed in a separate account in

the same or any other bank. True, Meinel & Wemple, Inc., kept an account in the books of the Second Russian, wherein a sum equaling three and one-half per cent on net premiums received monthly was debited as commissions, totaling $13,032.43 for the period since the previous demand. This debit, therefore, was at most an admission of a general indebtedness to H. Mutzenbecher, Jr. After the demand, and before the institution of liquidation proceedings by the Superintendent, additional commissions of $66,228.68 were debited to H. Mutzenbecher on the books of the Second Russian. No part of this sum, however, was segregated from the general funds, and placed in a separate bank account to the credit of Mutzenbecher, or to the credit of Meinel & Wemple, Inc., for the benefit of Mutzenbecher. In upholding the claim of the Custodian for the two items of $13,032.43 and $66,228.68, the Appellate Division seems to have assumed that these amounts had been placed in a special deposit for the benefit of Mutzenbecher. Such was not the fact, nor does the Custodian now assert it to have been. Nor is the theory, advanced by the Custodian, that as net premiums were received by the Second Russian a property interest therein immediately vested in Mutzenbecher, at all tenable. The contract, in relation to commissions payable by the Second Russian to Mutzenbecher, provided that the latter " will receive from us a commission of $3\frac{1}{2}$ per cent computed on the annual Net-Premiums on the treaties received from you." Here is a promise that Mutzenbecher will receive from the Second Russian a commission to be calculated by multiplying the figure of net premiums which the Second Russian might receive by the figure .035; not a provision whereby Mutzenbecher would acquire a fractional interest in the premiums as the Second Russian received them.

As Mutzenbecher was never other than a general creditor of the Second Russian it is not possible to under-

stand how the Custodian ever became other than a general creditor. Certainly, an assignment by Mutzenbecher to the Custodian would have transferred none other than a general debt; surely the demand could give rise to no greater property right. " Nor, indeed, could the Alien Property Custodian under such a demand, or unless he asserted a legal right to the securities themselves, by capture, change the character of the enemy's right as obligee." " Such a demand neither enlarges nor contracts the rights seized." (Per LEARNED HAND, J., in *Kahn* v. *Garvan*, 263 Fed. Rep. 909, 912.) True, the Custodian might have enforced satisfaction of the claims existing in Mutzenbecher, if any, as the obligations matured, by a resort to summary process under section 17 of the Trading with the Enemy Act. However, the Custodian never so proceeded, and, therefore, never acquired title to any specific fund, or possession thereof. While Congress, for the purposes of the war, might have authorized the Custodian to take from an enemy alien every contract obligation owing to him, it could not well enlarge the contract duty of the obligor by converting a general debt into an obligation to pay over a particular fund. However, no such attempt was ever made by Congress. It is provided in section 7, subdivision c, of the Trading with the Enemy Act as follows: " If the President shall so require, any money or other property owing or belonging to or held for  *  *  *  an enemy  *  *  *  shall be conveyed, transferred, assigned, delivered, or paid over to the alien property custodian." Moneys which must be " paid over " are clearly moneys which constitute a specific fund held for the benefit of the enemy. " A demand for the conveyance, transfer, assignment, delivery and payment of money or other property unless expressly qualified or limited shall be deemed to include every right, title, interest, and estate of the enemy in and to the money or other property demanded as well as every power and authority of the enemy thereover." (Rule 2 (a),

Executive Order of the President, Feb. 26, 1918; see Meares, Trading with the Enemy Act, p. 586.) In other words, the Custodian by his demand takes whatever title the enemy has; he takes and acquires no greater right.

If any authority were needed to support the proposition that the Custodian, by his demand upon the Second Russian that it pay the claim of its creditor, Mutzenbecher, acquired no lien upon the general funds of the Second Russian, theretofore unencumbered by such a lien, it may be found in the case of *Simon* v. *Miller* (298 Fed. Rep. 520). Simon had had financial dealings with Albert, an enemy alien. Originally he believed that there was owing Albert a balance of $350,000. In this belief he deposited the amount named in the American Exchange Bank, and agreed that he would not pay any part thereof to Albert, or withdraw the same until the end of the war, except upon the signature of himself and his counsel, a person trusted by the Department of Justice. Two separate demands for the money were made upon the American Exchange Bank by the Custodian. A third demand was served upon Simon affecting to seize the debt from the bank to him upon the asserted theory that the deposit was held for Albert's benefit. " So far there was no attempt to seize the account between the plaintiff and Albert, but on June 1, 1920, such a demand was made on the plaintiff. This determined that Albert was an enemy and that the plaintiff owed Albert, on a statement of the account, the sum of $635,640.96. This sum the demand attempted to seize, and the plaintiff was forthwith required to pay it to the Custodian. After a litigation not necessary to set forth, the Custodian got possession of the deposit in the American Exchange Bank, which this petition was filed to recover." The court held that the first three demands were ineffective for the reason that the bank did not hold the moneys in trust for Albert. As to the fourth demand, the court held that it was an effective capture of the debt owed by Simon to Albert but not

effective as a capture of the bank deposit. It said, through LEARNED HAND, J., as follows: " A creditor has no rights in his debtor's assets and is not concerned with their fate. The debt remains a general obligation, regardless of their disposition. Whatever makes invalid any payment by the debtor protects the captor of the debt. No possession is necessary, because none is possible; the captor is secure so long as the debtor cannot discharge the debt. How, then, can it be argued that the scheme of the act involved a payment of the debt *in præsenti?* The captor being protected, why must the debtor be exposed to execution *in limine?* " Again, it said that such a theory as to the scheme of the act " contradicts all our notions of the rights of putative debtors who dispute the debt;" that no such interpretation was called for; that " captures had a double purpose. They changed the title in any actual rights which the enemy might have in the captured property, and they sequestered the property itself in which those rights might inhere;" but that " these considerations cannot apply to the capture of a debt." The court not merely denied the right of the Custodian, through his demand, to capture the specific fund deposited; it held that even though the Custodian had obtained actual possession thereof he might not apply it upon the debt which had been seized, but must return. it to the debtor.

We now make no determination as to the validity of any claim which may be made on behalf of Mutzenbecher as a general creditor, or on behalf of the Custodian, for that question is not presently before us.

The order of the Appellate Division and that of the Special Term should be reversed and the claim dismissed, with costs to the Superintendent of Insurance in this court and in the Appellate Division.

CARDOZO, Ch. J., POUND, CRANE, LEHMAN, O'BRIEN and HUBBS, JJ., concur.

Orders reversed, etc.